1
2
3
4
5
6
7
8
9
10
11
12

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,                    )
                                             )     Case No. 2:10-cr-00235-JCM-PAL
                              Plaintiff,      )
                                             )     __ORDER AND REPORT OF FINDINGS__
vs.                                          )        __AND RECOMMENDATION__
                                             )
CHAISSON MICHAEL RODRIGUEZ,                   )     (Mtn to Suppress - Dkt. #20)
                                             )     (Mtn for Discovery -Dkt. #30)
                              Defendant.      )
_____     )

13    On September 21, 2010, the court held an evidentiary hearing on Defendant Chaisson Michael

14 Rodriguez's Motion to Suppress (Dkt. #20) filed July 14, 2010.  On July 28, 2010, the government filed

15 a Response (Dkt. #23), and Defendant replied (Dkt. #26) on August 5, 2010.  On August 26, 2010,

16 Rodriguez filed a Notice of Supplemental Authority (Dkt. #27).  The court has considered the motion,

17 the response, the reply, and the arguments of counsel made on the record at the hearing.  The court has

18 also considered Defendant's Motion for Pre-Hearing Discovery Pursuant to Federal Rule of Criminal

19 Procedure 16(a) (Dkt. #30) and the government's Response (Dkt. #33).

20                                    __BACKGROUND__

21    Rodriguez was initially charged in a Complaint (Dkt. #1) filed on May 4, 2010, with possession

22 of a firearm or destructive device not registered in the National Firearms Registration and Transfer

23 Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 and manufacture of a firearm or

24 destructive device in violation of 26 U.S.C. §§ 5822, 5861(f), and 5871.  Rodriguez made an initial

25 appearance on the Complaint on May 11, 2010.  *See* Dkt. #8.  On May 26, 2010, the grand jury returned

26 an Indictment (Dkt. #12) charging Rodriguez with possession of a firearm or destructive device not

27 registered in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841,

28 / / /

1  5861(d), and 5871 and manufacture of a firearm or destructive device in violation of 26 U.S.C. §§

2  5822, 5861(f), and 5871.  His motion seeks to suppress "all tangible and testimony evidence seized by

3  law enforcement on April 30, 2010."  The court granted an evidentiary hearing because the moving and

4  responsive papers indicated a number of factual disputes based upon the reports provided in discovery.

5  **I.     The Parties' Positions.**

6         **A.     Motion to Suppress (Dkt. #20).**

7         Rodriguez asserts that Officer VanBeveren's initial seizure was unreasonable and escalated into

8  a *de facto* arrest unsupported by probable cause.  Specifically, when Officer VanBeveren ordered

9  Rodriguez to show his hands and eventually used physical force to remove Rodriguez from the

10 threshold of his home, Rodriguez was unreasonably seized.  Rodriguez asserts the seizure escalated into

11 a *de facto* arrest when he was handcuffed and escorted to the patrol car.  Alternatively, even if the order

12 to show hands was a reasonable seizure, grabbing Rodriguez by the arm and pulling him from his

13 residence was not.  Any evidence seized from the home should be suppressed because the officers

14 conducted an illegal protective sweep.  However, even if the protective sweep was warranted, the

15 officers exceeded the scope of a protective sweep when they opened the duffel bag in Rodriguez's

16 bedroom.

17        Rodriguez also asserts that the search warrant obtained after the protective sweep of the home

18 lacked probable cause to search for marijuana, paraphernalia associated with the ingestion and

19 distribution of marijuana, U.S. currency, or the vehicles listed because police had no evidence to

20 establish a fair probability that each of these items was contraband or evidence of a crime.  The only

21 references to narcotics in the search warrant are that the officers smelled marijuana in Rodriguez's

22 home and that Officer VanBeveren knew Rodriguez possessed firearms and narcotics in the past.

23 Rodriguez also argues the warrant did not state probable cause to search the vehicles listed in items 8

24 and 9 of the search warrant affidavit.  Rodriguez contends the search warrant did not describe the

25 firearms to be seized in item 6 with sufficient particularity.  He asserts the phrase "[a]ny and all

26 firearms" is impermissibly vague and overly broad, and the warrant does not state probable cause to

27 seize any firearms.  The warrant and affidavit do not provide any information that Rodriguez was

28 disqualified from owning firearms, and absent such information, the issuing judge was not provided

2

1   with sufficient probable cause to believe any firearms were either contraband or evidence of a crime.

2   At most, the affidavit may have provided probable cause to seize the pellet gun allegedly observed by

3   Officer Spangler during his protective sweep.  Rodriguez also notes that the warrant does not seek

4   permission to search or seize ammunition.  Lastly, the good faith exception does not apply because the

5   warrant was so facially invalid no officer could objectively rely on it.

6   **B.    Government's Response (Dkt #23).**

7       The government asserts that HPD acted reasonably under the circumstances in detaining

8   Rodriguez, conducting a protective sweep of his residence, and securing a search warrant.  The

9   government concedes that VanBeveren's order for Rodriguez to produce his hands was a seizure, but

10  asserts it was reasonable under the circumstances because: (a) of the nature of the call; (b) VanBeveren

11  was aware of Rodriguez's prior criminal history; (c) VanBeveren feared Rodriguez was armed; and (d)

12  Rodriguez was attempting to make himself appear armed by the way he positioned his body and kept

13  his left hand behind the door.  The government asserts that the limited intrusion in ordering Rodriguez

14  to show his hands was a *de minimus* intrusion under the circumstances arising out of a legitimate

15  concern for officer safety and was reasonable.  The government argues that in grabbing Rodriguez and

16  pulling him into full view, VanBeveren's purpose was to ascertain whether or not Rodriguez possessed

17  a weapon to ensure officer safety.  Rodriguez's behavior, coupled with the reason officers were there,

18  justified their conduct.

19      The government argues that Rodriguez's detention was not an arrest that required probable

20  cause.  Based upon Rodriguez's conduct on the porch, the fact that he refused to keep his hands out of

21  his pockets, and the fact that Rodriguez had previously been arrested for carrying a concealed weapon,

22  officers placed him in handcuffs and moved him to the patrol car.  The government concedes this was a

23  seizure, but asserts it was a valid investigatory detention and a means of protecting officer safety.  The

24  government relies on a line of cases holding there is no bright line between an investigatory detention

25  and an arrest, and officers were not required to use the least intrusive means to detain Rodriguez.

26  Assuming *arguendo* Rodriguez was under arrest, the government argues the officers had probable cause

27  to arrest him "for several crimes."

28  / / /

The protective sweep was warranted because Rodriguez initially claimed that his twin brother had fired the pellet gun at the neighbor's house.  Furthermore, Rodriguez's mother began to behave suspiciously and answer evasively when officers asked whether anyone else was in the home, stating that her boyfriend might be in the home.  Rodriguez also told Sage he owned a firearm and had a Glock pistol in the house, and he attempted to make himself appear armed when VanBeveren initially spoke to him in the doorway of the home.  The government's Response states that as Rodriguez was led to a patrol car, he "yelled back to McKenna to not let officers inside the house."  Resp. at 14:14.  Although this statement is contained in Officer VanBeveren's report, none of the officers were asked about this at the hearing by either counsel.  All these factors justified conducting a protective sweep which lasted approximately three minutes.  The government disputes that the officers exceeded the scope of a permissible protective sweep and specifically disputes that the officers opened a closed duffel bag containing pipe bombs.  The government notes there were two separate bags which contained pipe bomb materials in Rodriguez's room, one of which was an open camera bag.  Henderson Police Department ("HPD") did not search the black duffel bag, which contained disassembled pipe bomb components, until after they obtained a search warrant.

The government contends the search warrant contained ample probable cause to search for the items listed.  At a minimum, the warrant set forth probable cause to believe there would be "paraphernalia commonly associated with the ingestion . . . of the controlled substance marijuana" because officers smelled it after Rodriguez had opened the front door.  The government notes that nothing described in items 2, 3, and 5–which Rodriguez claims are defective–were seized during execution of the search warrant.  Additionally, even if those provisions of the search warrant were not supported by probable cause, there was still probable cause to search for evidence relating to items 1, 4, 6, and 10.  With regard to the vehicles, they were located in the curtilage of the residence, and the Fourth Amendment permits a search of buildings and all other objects within the curtilage of a residence specified in the search warrant.  With regard to the firearms, there was probable cause to search for all firearms because of the nature of the offense HPD was investigating coupled with the fact that Rodriguez told officers there were weapons inside his home.  Thus, this search warrant was reasonably specific given the information the officers had because the Ninth Circuit has held that a

4

warrant may support the seizure of an entire class of items if a more specific description is not available. Rodriguez's neighbor did not know what kind of weapon was used to shoot at his house, and Rodriguez said he had weapons in the house. Additionally, the fact that the officers found ammunition in the home simply tends to support the notion that Rodriguez possessed firearms. Relying on the severance doctrine, the government argues that if the court finds that probable cause existed for some, but not all, of the items listed in the warrant, it should only suppress those items for which no probable cause exists.

Finally, the government asserts that the good faith exception applies in this case because Rodriguez has not alleged the issuing judge abandoned his neutral role in reviewing the application, the search warrant described the place to be searched and the things to be found in adequate detail, or the affidavit is so lacking in probable cause that no reasonable officer could not rely on it in good faith. Rodriguez has also not made a substantial showing of deliberate falsehood or of reckless disregard for the truth to prohibit the application of *Leon's* good faith exception.

### C.   Rodriguez's Reply (Dkt. #26).

Rodriguez disputes a number of factual allegations enumerated in the government's Response, indicating they have not been disclosed in discovery. Additionally, Rodriguez reiterates that he was unreasonably seized from his home by HPD officers and arrested without probable cause. He acknowledges that handcuffing a suspect by itself is insufficient to convert an investigatory detention into an arrest but asserts that there was no reason to handcuff and escort him to the hood of a patrol vehicle once a patdown confirmed Rodriguez had no weapons. He asserts that at the time officers arrested him, they had not collected any information to support probable cause that Rodriguez was responsible for shooting the neighbor's house. He also notes there is no indication in any of the reports prepared by police that Rodriguez was using or impaired by a controlled substance. Furthermore, the government has not pointed to any specific and articulable facts to believe anyone else was in the home to justify the protective sweep. Rodriguez notes that there is a discrepancy between the government's Response and the police reports produced in discovery. Specifically, Officer Spangler's report states he observed an open black duffel bag containing pipe bombs during the protective sweep; however, the Response states that Officer Sage observed an open black camera bag.

1    Rodriguez also asserts that the government's position that officers smelled marijuana upon

2    contacting Rodriguez on the porch is not supported by Officers' VanBeveren's and Spangler's reports

3    which state that they smelled marijuana only after they had seized Rodriguez and returned to the home

4    to speak with Ms. McKenna.  Because this information was learned *after* Rodriguez's illegal arrest, the

5    court may not consider it in determining whether there was probable cause to search the home for

6    marijuana.  The affidavit supporting the search warrant does not state Rodriguez was impaired.

7    Therefore, the issuing judge could not have considered this in determining whether probable cause

8    existed.  Everything seized from the home should therefore be suppressed as the fruit of Rodriguez's

9    illegal seizure and *de facto* arrest.  Additionally, evidence obtained during the unjustified protective

10   sweep should be excluded from the search warrant.  Without this information, the warrant lacked

11   probable cause.

12   Even assuming the officers had probable cause to believe someone in the house was smoking

13   marijuana, they had no reason to believe the home would contain evidence of illegal distribution or

14   consumption of marijuana because smelling the odor of marijuana is not enough to establish probable

15   cause for either.  Rather, the smell of marijuana gives rise only to reasonable suspicion of possession of

16   marijuana, a low-level misdemeanor under both state and federal law.  Rodriguez contends that officers

17   had information when they arrived at Rodriguez's home that someone had shot a neighbor's house with

18   a pellet gun, and Rodriguez ultimately admitted he shot at the house with a pellet gun.  Thus, Rodriguez

19   asserts, HPD should have provided a more specific description of the "firearm" sought in the warrant,

20   and any other firearms discovered should be suppressed because the warrant was not particular in its

21   description.  Rodriguez also argues that a pellet gun is not a firearm as defined by either federal or

22   Nevada law.  Finally, Rodriguez argues that the good faith exception does not apply because the

23   warrant was issued on the basis of illegally-obtained information, and suppression of all the evidence

24   obtained would accomplish the purpose of the exclusionary rule.

25       **D.       Rodriguez's Notice of Supplemental Authority (Dkt. #27).**

26   Rodriguez cites a recent *en banc* decision by the Ninth Circuit, *Millender v. County of Los*

27   *Angeles*, No. 07-55518 (9th Cir. Aug. 24, 2010) (en banc), to support his position that HPD officers

28   should have described the pellet gun with greater particularity in the application for a search warrant

6

they submitted to Judge George.  There, the Ninth Circuit analyzed whether the authorization to search for firearms and firearms-related items satisfied the specificity test set forth by the Ninth Circuit in *United States v. Spilotro*, 800 F.2d 859, 963 (9th Cir. 1986).  In *Millender*, the court found the clause in the warrant was overly broad and did not state probable cause to search for all firearms and firearms-related items because police were aware of only one specific shotgun in defendant's possession.  Rodriguez asserts that the facts here are similar, and the court should find that there was no probable cause to search for "[a]ny and all firearms" because law enforcement was only aware of Rodriguez's possession of a pellet gun.

**E.      Rodriguez's Motion for Discovery (Dkt. #30) & Government's Response (Dkt. #33).**

Prior to the September 13, 2010, evidentiary hearing, Rodriguez filed a motion seeking to compel discovery from the government regarding the facts contained in the government's Response (Dkt. #23) to the Motion to Suppress.  Specifically, Rodriguez requested the government produce a report prepared by Officer Sage, any other discovery used to support the government's Response (Dkt. #23) and any other discovery in its possession or control.  The government responded that it conducted a review of all discovery and Rodriguez has received a copy of the government's entire file as it pertains to the evidentiary hearing.  Additionally, on September 15, 2010, the government also provided a supplemental report prepared by Officer Sage.  The government therefore believes that all pre-hearing discovery disputes have been resolved.  Rodriguez did not file a reply or raise any issue concerning pre-hearing discovery at the evidentiary hearing.  Accordingly, the Motion for Discovery (Dkt. #30) will be denied as moot.

**II.      Evidence Before the Court.**

**A.      Testimony of Officer Seth VanBeveren**

Officer VanBeveren has been employed for four and a half years as a police officer with HPD.  On April 30, 2010, he was dispatched to 2190 Polynesia Court in Henderson, Nevada around 6:00 a.m.  A male, later identified as Ryan Deering, reported hearing popping noise from his neighbor's house and that something hit his roof.  He reported that either a BB gun or a pellet gun was being shot at his residence.  VanBeveren was the first to arrive at the scene, and he made contact with Mr. Deering before other units arrived.  Mr. Deering stated that he had been in his backyard when he heard a

1   popping noise coming from the north side of his home.  He heard something like a BB or pellet hit his

2   roof several times.  He looked to the north at 75 Motu Court and saw the upstairs bedroom window of

3   that house open partially. He yelled out to his neighbor, and the window shut.  Deering's house had

4   been shot at before.  Mr. Deering went to 75 Motu Court and knocked on door.  Although no one

5   opened the door, a male responded through the closed door that he was not shooting, but it was his twin

6   brother.  The male refused to talk with Mr. Deering.  Mr. Deering went home and called HPD.

7       While VanBeveren was talking with Mr. Deering, Officer Jason Spangler arrived, and together

8   they went to 75 Motu Court to make contact.  They knocked on the door, and VanBeveren stood to right

9   of the door while they waited for a reponse.  Van Beveren testified he knocked for approximately forty-

10  five or sixty seconds.  While waiting, VanBeveren could hear rustling inside.  A male answered door,

11  and VanBeveren recognized him as Defendant Chaisson Rodriguez.  He recognized Rodriguez because

12  VanBeveren had recently issued Rodriguez a citation for trespass.  Van Beveren was also aware that

13  Rodriguez's criminal history included arrests for carrying a concealed weapon and robbery.

14      When Rodriguez opened the door, he only opened it a foot or a foot and a half wide, and his

15  body blocked the doorway.  Rodriguez kept his left hand behind the door.  VanBeveren told Rodriguez

16  he and Officer Spangler were there because a neighbor said his house was being shot with a BB or

17  pellet gun.  VanBeven could only see Rodriguez's right hand and was concerned because he was aware

18  of Rodriguez's prior record and because he was responding to a gun call.  VanBeveren could not see

19  Rodriguez's left hand at all.  When VanBeveren asked to see both hands, Rodriguez said no.

20  VanBeveren could tell Rodriguez's left hand was moving around, and VanBeveren wondered what

21  Rodriguez had in his hand.

22      When Rodriguez refused to show his hands, VanBeveren asked if Rodriguez would just come

23  out on the porch and talk.  Rodriguez stepped out, but he kept his left hand behind the door.

24  VanBeveren grabbed Rodriguez by the right wrist with his left hand but did not cross the threshold to

25  enter the house.  VanBeveren had his right hand on his weapon.  As Rodriguez exited the house, he

26  brought his left hand out from behind the door.  VanBeveren let go of Rodriguez's right wrist because

27  Rodriguez did not have anything in his hands.

28  / / /

8

1   Rodriguez was wearing jeans and no shirt.  While standing on the porch area, VanBeveren tried
2   to question Rodriguez again.  Rodriguez put his hands in his pockets.  VanBeveren asked him to
3   remove his hands from his pockets for officer safety reasons.  Rodriguez attempted to put his hands in
4   his pockets a second and a third time despite VanBeveren's request that he not do so.  VanBeveren
5   placed Rodriguez in handcuffs because VanBeveren was concerned for officer safety because of
6   Rodriguez' s prior arrests, because he was on gun call, and because Rodriguez was not listening to him.
7   After Rodriguez was placed in handcuffs, VanBeveren patted him down for weapons on the outside of
8   his jeans.  No weapons were found.

9   VanBeveren then escorted Rodriguez to a patrol car parked in front of the house.  Officer
10  Spangler went to the house to talk to Rodriguez's mother, Michelle McKenna.  VanBeveren advised
11  Rodriguez that he was not under arrest, and Rodriguez stated that he understood.  VanBeveren asked
12  Rodriguez who was shooting Mr. Deering's house with a BB gun.  Rodriguez said that he had been
13  asleep and that it was his twin brother.  After further questioning, Rodriguez stated that he did not have
14  a twin brother and that he shot the neighbor's house.

15  Officer Sage arrived and came to where VanBeveren was questioning Rodriguez.  Officer Sage
16  stayed with Rodriguez, and VanBeveren went to speak with Ms. McKenna and Officer Spangler.  Ms
17  McKenna permitted him to step into the foyer, and when he stepped in the house, the air smelled
18  strongly of marijuana.  Ms. McKenna said that she did not know whether her son shot the neighbor's
19  house because she had been asleep.  She said she was not aware of another time that Rodriguez had
20  shot the neighbor's house.  She said she did not know why the house smelled like marijuana and was
21  not aware of any marijuana in the house.  When VanBeveren asked whether anyone else was in the
22  home, she hesitated and looked over her shoulder toward the stairway.  VanBeveren asked Spangler
23  whether he had noticed the smell and Ms. McKenna's hesitancy in responding whether anyone was in
24  the home, and Spangler indicated he had.

25  VanBeveren returned to the patrol car and spoke with Officer Sage, advising him of his contact
26  with Ms. McKenna.  Officer Sage told VanBeveren about his conversation with Rodriguez.
27  VanBeveren waited with Rodriguez at the patrol car while Officer Sage went to the foyer of the home
28  to speak with Ms. McKenna.  VanBeveren placed Rodriguez in the patrol car and went back to the front

door to speak with the other officers.  After they conferred, the officers decided to conduct a protective sweep of the home.  Ms. McKenna refused permission to enter the home.  VanBeveren waited outside the home while the sweep was conducted by Officers Sage and Spangler.

On cross examination, VanBeveren stated that he and his fellow officers were wearing their uniforms and badges, and their guns were visible.  His prior contact with Rodriguez was several months prior to this incident.  He had no personal information that Rodriguez was armed, nor had Rodriguez made any threats to anyone.  VanBeveren stated that during the encounter, Rodriguez was not verbally abusive, nor did he appear to be under the influence of alcohol or a controlled substance.  VanBeveren admitted that although he told Rodriguez that he was not under arrest, Rodriguez was not free to leave.

VanBeveren stated that he did not read Rodriguez *Miranda* warnings before asking him questions.  Prior to the protective sweep, Ms. McKenna was escorted outside of the house and placed next to a patrol vehicle.  She had not given officers permission to search the house, and she told officers that there was no one else inside the house.  VanBeveren acknowledged that although he tries to include important details in his reports, it does not mention that a sweep was conducted because Rodriguez owned a firearm.  There is also nothing in his report about Rodriguez owning a Glock firearm or that his best friend was in the home.

On redirect, VanBeveren stated that Rodriguez could have been under the influence of something.  He also testified that Officer Sage informed him that Rodriguez owned a Glock prior to the protective sweep.  VanBeveren stated that the total time from his initial contact with Rodriguez to the termination of the protective sweep was twenty minutes.  On recross, VanBeveren admitted his report says nothing about any inconsistent statements made by McKenna.  Upon questioning by the court, VanBeveren clarified that Officer Sage mentioned Rodriguez's Glock after VanBeveren left Rodriguez to speak with Officer Spangler.  When VanBeveren returned to the patrol car, Officer Sage said Rodriguez had a Glock in house.

**B.    Testimony of Officer Jason Spangler.**

After Officer Spangler arrived at 75 Motu Court, he and Officer VanBeveren approached the home.  Rodriguez answered the door, and while VanBeveren spoke with him, Spangler looked behind Rodriguez into the home.  Rodriguez appeared to be manipulating something with his left hand behind

the door.  Spangler unsnapped his gun holster, removed his gun, and held his gun at a "low ready"
position for officer safety.  Rodriguez was not listening to VanBeveren's request that he show his hands
and was doing something behind the door.  VanBeveren continued talking to Rodriguez and asked him
to step onto the porch.  Rodriguez began to leave the home but kept his left hand behind the door.
VanBeveren grabbed Rodriguez by the right wrist as Rodriguez exited the home.  The door flung open,
and Spangler could see there was nothing in Rodriguez's hand.  VanBeveren released Rodriguez's wrist
and began to walk him toward the driveway.  Spangler overheard VanBeveren telling Rodriguez to keep
his hands out of his pocket.

As Spangler looked into the house, he observed a woman inside.  Spangler observed a tile entry
area that opened up to the living room.   There was a kitchen behind the living room, and immediately
next to the entryway on the left were stairs.   Spangler spoke with the woman in the home, Michelle
McKenna.  He explained why he and Spangler were there.  Ms. McKenna stated that she did not own
guns, and she did not think her son owned any guns.  McKenna allowed Spangler into foyer.  Entering,
he smelled the "overpowering smell" of marijuana.   When asked whether anyone else was in the home,
McKenna's demeanor changed, and she acted nervously and began to sweat on her upper lip.

VanBeveren returned to the house and spoke with Spangler.  Spangler reported that McKenna
was deceptive and nervous.  VanBeveren advised Spangler that Rodriguez said there were guns in the
house.  VanBeveren and Spangler decided to conduct a protective sweep of house to look for anyone
else in the house and to determine whether anyone was injured.

Officers Spangler and Sage conducted the protective sweep.  As Spangler was looking in an
upstairs bedroom, he observed a blanket covering a pile of clothes.  Spangler believed someone could
have been hiding there, so he pulled the blanket away and saw what appeared to be an assault rifle,
which was later determined to be a BB or pellet gun.  Just after he discovered the gun, Sage called him
into another room and pointed down to an open nylon camera bag containing pipes.  Spangler testified
that the pipes were approximately twelve inches long, metal, and they had caps on the end.  Spangler
and Sage terminated the protective sweep after discovering the pipe pipe bombs approximately three

/ / /

/ / /

1  minutes after the sweep began.  They called the ARMOR[1] [bomb squad] unit about the pipe bombs and

2  evacuated the neighborhood.  A search warrant was subsequently obtained to search 75 Motu Court.

3        On cross-examination, Spangler testified that Officer Ryan Adams did the main report about the

4  incident, and Spangler did a supplemental report.  He completed his supplemental report on same day as

5  incident.  Spangler testified that as Rodriguez was exiting the house, Spangler could not see

6  Rodriguez's left hand.  Spangler did not personally see Rodriguez taken to the front of the patrol car.

7  McKenna did not want police to search the house.  He admitted that his report makes no mention about

8  finding the BB/pellet gun that looked like an assault rifle, or that it had been covered by a sheet or

9  blanket.

10        On redirect, Spangler stated that based upon Rodriguez's conversation with Officer Sage,

11  officers believed another person or a firearm might be in the house.  He testified that there was a second

12  bag in the house–a duffel bag containing pipe bombs–which was discovered and opened during

13  execution of the search warrant.  This duffel bag had not been opened or discovered during the

14  protective sweep.  The open nylon camera bag was discovered during the protective sweep.

15        **C.    Testimony of Officer Michael Sage.**

16        Officer Sage is a patrol officer with HPD.  On April 30, 2010, he was dispatched to Polynesia

17  Court.  When he arrived, he saw VanBeveren at a patrol vehicle with Rodriguez.  VanBeveren and

18  Spangler went to 75 Motu Court to speak to Ms. McKenna.  They had been at the scene approximately

19  ten minutes prior to Sage's arrival.  VanBeveren told Sage there might be other people in the house.

20        Sage stayed with Rodriguez at the patrol vehicle.  Rodriguez was in handcuffs and stared off

21  into space while making statements.  Rodriguez stated he had a twin brother, and then a best friend in

22  the house along with his Glock.  Rodriguez initially stated he had been asleep when the shooting had

23  occurred.  Sage went to the house to speak with Officer Spangler and Michelle McKenna.  The smell of

24  marijuana was emanating from the front door.  McKenna told Officers Spangler and VanBeveren that

25

26        [1]The Motion to Suppress indicates ARMOR (All Regional Multi-Agency Operations and
   Response) is a unit of Las Vegas Metropolitan Police Department responsible for the investigation,
27  remediation, and disposition of all criminal incidents related to nuclear, biological, chemical, and
28  explosive events in Clark County, Nevada.

she did not know if anyone was in the home.  As she responded, she glanced behind her several times. She told the officers she said she did not think Rodriguez had firearms, but she was not sure if there were any in his bedroom.  McKenna said her son often had sleepovers, and she did not know what he kept in his bedroom because it was often locked. McKenna also mentioned her boyfriend might be in the house.  Eventually she said her boyfriend was not there, but she continued looking behind her and up the stairs.

Sage knew the officers were going to apply for search warrant for marijuana based upon the strong odor.  He stated he was concerned with officer safety because of McKenna's behavior.  The officers decided to conduct a protective sweep.  They went through every room.  In the bedroom searched by Spangler, Sage observed what he believed to be an AK-47.  In the last bedroom he entered, he looked behind chair and saw an open nylon camera bag with pipe bombs in it.  He called in Spangler to observe the nylon camera bag and its contents, and they left the residence.  Sage testified that the sweep lasted only two or three minutes, and he and Spangler only looked in areas where someone could have been hiding.   Sage did not see a closed duffel bag with pipe bombs while conducting the protective sweep.

On cross-examination, Sage stated that he prepared his report last week, five months after the incident.  He had not written notes after the event or prepared any other reports.  Prior to writing his report, he discussed the pending motion to suppress with his fellow officers but did not know specifically what the motion asserted.  This case had come up several times in conversation with VanBeveren and Spangler.  Sage read VanBeveren's and Spangler's reports before drafting his own.

While questioning Ms. McKenna, Sage heard a lot of noise and movement in the house.  Ms. McKenna said that it was her dogs.  Sage said that when he saw the pellet gun that appeared to be an assault rifle, it was "partially in plain view."

On redirect, Sage clarified that he did not find the rifle but observed it.  Spangler found it. Ms. McKenna's actions and her vague answers to questions were among the reasons for the protective sweep.  He did not believe McKenna.  He also noted that the marijuana smell in the foyer was strong, but he could not identify whether it was "fresh" or not.

/ / /

13

1    Upon questioning by the court, Sage stated that the assault rifle/BB gun was on top of, and

2    partially concealed by, a mound of clothing.

3         **D.      Testimony of Special Agent Dan Heenan.**

4         Special Agent Heenan is employed by the Bureau of Alcohol, Tobacco, Firearms, and

5    Explosives.  He participated in executing the search warrant at 75 Motu Court.  He testified to finding a

6    black Adidas duffel bag in the southeast bedroom along the north wall of the bedroom containing pipe

7    bombs.  At the time he found the duffel bag, it was closed.

8    **III.    Applicable Legal Authority & Analysis**

9         The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

10   papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.  The Fourth

11   Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United States*,

12   389 U.S. 347 (1967).  The Fourth Amendment protects "people not places."  *Id.*  Evidence obtained in

13   violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the

14   poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

15        **A.      The Initial Encounter**

16        Rodriguez asserts he was seized and arrested without probable cause during his initial contact

17   with law enforcement.  The government contends the initial contact between Rodriguez and HPD was

18   not an arrest, but rather an investigatory detention for which HPD had reasonable suspicion to detain

19   and question Rodriguez.

20        For Fourth Amendment purposes, a seizure occurs "when the officer, by means of physical force

21   or show of authority, has in some way restrained the liberty of a citizen."  *Terry*, 392 U.S. at 19, n.16.

22   In *United States v. Mendenhall*, 446 U.S. 544 (1980), the United States Supreme Court developed what

23   the courts have referred to as the *Mendenhall* test for when a seizure occurs: "[A] person has been

24   'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances

25   surrounding the incident, a reasonable person would have believed that he was not free to leave."  *Id.* at

26   554.  Rodriguez was grabbed by the arm as he stepped out of his home.  When he ignored commands to

27   keep his hands out of his pockets, he was handcuffed and escorted to a patrol vehicle.  He was clearly

28   seized for Fourth Amendment purposes.  The government argues the seizure was an investigatory

14

1  detention based on reasonable suspicion.  Rodriguez asserts his seizure was unreasonable and escalated

2  to a *de facto* arrest for which no probable cause existed.

3            **1.**    **Investigatory Detentions**

4         An investigatory detention, under the Fourth Amendment, must be supported by "reasonable

5  suspicion" that criminal activity may be afoot.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  In

6  assessing whether an officer has reasonable suspicion to conduct an investigatory detention, reviewing

7  courts look at the "totality of the circumstances" of each case to see whether the detaining officer had a

8  "particularized and objective basis" for suspecting legal wrongdoing.  *Arvizu*, 534 U.S. at 273.  "An

9  investigatory stop must be justified by some objective manifestation that the person stopped is, or is

10  about to be, engaged in criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also*

11  *United States v. Sigmond-Ballasteros,* 285 F.3d 1117, 1121 (9th Cir. 2002) (*citing Arvizu*, 534 U.S. at

12  273).  A reviewing court's determination of reasonable suspicion is a process that "allows officers to

13  draw on their own experience and specialized training to make inferences from and deductions about

14  the cumulative information available to them that 'might well elude an untrained person.'"  *Arvizu*,

15  534 U.S. at 273 (*citing Cortez,* 449 U.S. at 418).  The Fourth Amendment is satisfied if an officer's

16  action is supported by reasonable suspicion to believe that criminal activity may be afoot and

17  observation of factors which are by themselves consistent with innocence may collectively amount to

18  reasonable suspicion.  *Id.* at 273-74.  Reasonable suspicion is not a matter of hard certainties, but of

19  probabilities.  *Cortez*, 449 U.S. at 417-18.  However, reasonable suspicion requires more than an

20  officer's "hunch" even if the hunch later turns out to be a good one.  *Terry*, 392 U.S. at 27.  The

21  reasonable suspicion standard is less than a preponderance of the evidence.  *United States v. Sokolow*,

22  491 U.S. 1, 7 (1989).

23         In *Adams v. Williams*, the Supreme Court explained its holding in *Terry* as follows:

24                In *Terry*, this Court recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes

25                of investigating possible criminal behavior even though there was no probable cause to make an arrest.  The Fourth Amendment does not require

26                a policeman who lacks the precise level of information necessary for probable cause to simply shrug his shoulders and allow a crime to occur or

27                a criminal to escape.  On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop

28                of a suspicious individual, in order to determine his identity or to maintain

> the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

407 U.S. 143, 145-147 (1972) (citations omitted).

During an investigatory detention, an officer may frisk an individual for weapons where he has reason to believe that he is dealing with an armed and dangerous individual. *Terry*, 392 U.S. at 27. *Terry* held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, wherein the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30.

The Ninth Circuit has "identified a wide variety of factors that can support a reasonable belief that an individual is armed." *United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006).  Significant weight is given to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon.  *Id.*  Sudden movements, or repeated attempts to reach for an object that is not immediately visible may give rise to a reasonable suspicion a defendant is armed.  *Id.* at 1158.  The nature of the crime suspected, and whether it is associated with weapons may create reasonable suspicion for a pat down search.  *Id.*  However, to comport with the Fourth Amendment, a police officer must have more than a reasonable belief that *if* the individual with whom contact is made is armed, he or she would be dangerous.  *Id.*

The use of handcuffs, while not dispositive, "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical Terry stop."  *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (handcuffing justified by possibility that another suspect lurked in the vicinity).  However, the Ninth Circuit has recognized that its use is important for "police conducting on-the-scene investigations involving potentially dangerous subjects" and noted those police "may take precautionary measures if they are reasonably necessary."  *Id.*  In *United States v. Delgadillo-*

16

*Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1985), and *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990), the Ninth Circuit found that the use of restraints contributed to the court's findings that the defendants had been arrested because both defendants were fully compliant with officers' instructions, and there was no evidence suggesting they were dangerous or that safety considerations required such intrusive methods of restraint. *See also Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995). However, in *United States v. Taylor*, 716 F.2d 701, 708-09 (9th Cir. 1983), the court found handcuffing was justified because the suspect disobeyed an order to raise his hands and made furtive movements.

Lastly, "inquiries during investigative stops need not always be limited to one or two questions, provided the questions asked are reasonably related in scope to the justification for their initiation." *Bautista*, 684 F.2d at 1290; *see also United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974), *cert. denied,* 420 U.S. 924 (1975) (Terry stop lasting more than an hour did not violate the Fourth Amendment; the scope of inquiry did not go beyond the justification for the stop, and the extended detention was justified by the police officers' attempt to check the suspects' unsatisfactory and evasive answers to routine questions). Previously, the Ninth Circuit held in *United States v. Chavez-Valenzuela*, 268 F.3d 719 (9th Cir. 2001), that during a traffic stop, a police officer may only "ask questions that are reasonably related in scope to the justification for his initiation of contact" and may expand the scope of the questioning beyond the initial purpose only if he or she "articulate[s] suspicious factors that are particularized and objective." *Id.* at 724. However, the Ninth Circuit has since recognized the Supreme Court's opinion in *Muehler v. Mena*, 544 U.S. 93 (2005) (holding that no reasonable suspicion is required to justify questioning that does not prolong the stop), abrogated its previous holding in *Chavez- Valenzuela. See, e.g., United States v. Turvin*, 517 F.3d 1097, 1100 (9th Cir. 2008); *United States v. Washington,* 490 F.3d 765, 770 (9th Cir. 2007); *United States v. Mendez*, 476 F.3d 1077, 1079-80 (9th Cir. 2007).

### 2.   <u>Arrests</u>

The most intrusive level of contact between a citizen and a police officer is an arrest. An arrest is a seizure which must be supported by probable cause. *Adams*, 407 U.S. at 148-49. There is no bright line rule for determining when an investigatory detention is converted into a full-fledged arrest. *United*

1   *States v. Sharpe*, 470 U.S. 675, 685 (1985); *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.

2   1987); *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).   The determination of whether a

3   *Terry* stop has been converted into a full-fledged arrest requires an examination of the totality of the

4   circumstances surrounding the encounter, and each case must be decided on its own facts.  *United*

5   *States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988).  "Pointing a weapon at a suspect, ordering him to

6   lie on the ground, handcuffing him, and placing him for a brief period in a police vehicle for

7   questioning–whether singly or in combination–does not automatically convert an investigatory

8   detention into an arrest requiring probable cause."  *Allen v. City of Los Angeles*, 66 F.3d at 1056.  "The

9   use of force in making a stop will not convert the stop into an arrest 'if it

10  occurs under circumstances justifying fears for personal safety.'"  *Id. (quoting United States v. Jacobs*,

11  715 F.2d 1343, 1345-46 (9th Cir. 1983)).  The ultimate inquiry is whether a reasonable person would

12  believe himself to be under arrest, and the Ninth Circuit focuses on whether the police had their guns

13  drawn, whether the defendant was handcuffed, whether the defendant's liberty was restricted, and the

14  number of officers that were present.  *Lambert*, 98 F.3d at 1186, 1188-90.

15      Here, Rodriguez maintains that his seizure escalated into a *de facto* arrest because he was asked

16  to show his hands, he was physically moved by Officer VanBeveren, and he was handcuffed, patted

17  down, and placed near a patrol vehicle.  The government concedes that Rodriguez was seized but

18  asserts that he was not arrested, and his detention was reasonable under the Fourth Amendment.  The

19  government maintains that the officers' physical restraint of Rodriguez on the porch and later

20  handcuffing were justified because officers believed, based upon Rodriguez's prior history, Rodriguez's

21  behavior, and the nature of the call, that he may have been armed.

22      The court finds that HPD conducted an investigatory detention of Rodriguez which was based

23  upon reasonable suspicion.  HPD had reasonable suspicion to believe that someone in Rodriguez's

24  home had fired a BB/pellet gun at Mr. Deering's house, and as a result, they had reasonable suspicion to

25  question Rodriguez as well as any other occupants of 75 Motu Court.  Officer VanBeveren's actions in

26  grabbing Rodriguez's right wrist was justified because of Rodriguez's failure to comply with

27  VanBeveren's request that he show his hands, his furtive movements behind the door with his left hand,

28  the fact that officers were present on a gun call, and the officer's knowledge of Rodriguez's previous

1   arrests for carrying a concealed weapon and robbery.  Rodriguez was not handcuffed until after ignoring

2   repeated requests to keep his hands visible and out of his pockets.  Handcuffing Rodriguez did not

3   automatically convert the detention into an arrest.

4          Additionally, the court finds that under the totality of the circumstances, there was reasonable

5   suspicion to pat Rodriguez down for weapons.  Police were responding to a call that someone in the

6   residence was shooting a pellet gun at the neighbor's house.  The neighbor shouted at someone at a

7   partially-opened second story window, the window closed, and the shooting stopped.  The neighbor

8   reported knocking on the door of the residence and speaking to a male who refused to open the door

9   and who denied shooting, claiming his twin brother had done it.  When officers arrived, Rodriguez

10  positioned his body and kept his left hand behind his back in a way which made the officers fear he was

11  hiding a weapon.  He continued to hold his left hand behind his back as he stepped forward.  Combined,

12  these circumstances made it objectively reasonable to pat Rodriguez down for weapons and to handcuff

13  him when he refused to keep his hands visible.  Furthermore, the stop lasted no longer than was

14  necessary to question Rodriguez about the shooting that had occurred and to conduct a protective sweep

15  to ensure that no one else was in the residence with access to weapons Rodriguez stated were in the

16  home.

17          **B.      The Protective Sweep of Rodriguez's Home.**

18          As a general matter, warrantless searches of a home are presumptively unreasonable.  *Groh v.*

19  *Ramirez*, 540 U.S. 551, 559 (2004); *United States v. Lemus*, 582 F.3d 958, 961 (9th Cir. 2009).  The

20  government bears the burden of showing a warrantless search "fall[s] within certain established and

21  well-defined exceptions to the warrant clause."  *Delgadillo-Vasquez*, 856 F.2d at 1298.  A protective

22  sweep of a residence without a warrant may only be justified by the exigent circumstances exception to

23  the warrant requirement.  *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  A protective sweep must be

24  supported by "specific and articulable facts supporting the belief that other dangerous persons may be in

25  the building or elsewhere on the premises."  *Delgadillo-Vasquez*, 856 F.2d at 1298 (*citing Whitten*, 706

26  F.2d 1000, 1014 (9th Cir. 1983)).  Where, however, all suspects have been "immediately handcuffed

27  and searched," there is no justification for a protective sweep because all individuals at the scene have

28  been accounted for.  *Id.* at 1299.  Police are permitted to conduct protective sweeps in order to protect

themselves from surprise or attack, and it is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger." *Buie,* 494 U.S. at 1099.

Here, HPD officers had specific and articulable facts supporting the belief that other persons posing a potential danger to them may be in the home.  Both Rodriguez and McKenna made conflicting statements about whether anyone else was in the home, and McKenna's demeanor changed when she was questioned on the matter.  Rodriguez initially stated to both Officer VanBeveren and Officer Sage that his twin brother had shot the BB/pellet gun before he confessed he did it.  He also stated that his best friend might be in the house.  McKenna initially denied knowing whether anyone else was in the house then stated that her boyfriend might be in the home.  When VanBeveren asked whether anyone else was in the home, McKenna hesitated and looked over her shoulder to the stairway.  Officers speaking to McKenna heard a "rustling noise" in the house which McKenna said were her dogs.  McKenna said her son often had sleepovers, and she did not know if any of his friends were there.  Sage testified McKenna's demeanor changed, and she became visibly nervous, sweating on her upper lip, when asked whether anyone else was in the house.  Only after she was removed from the home did she claim no one else was in the home.

When questioned about drugs and weapons in the home, Rodriguez told Officer Sage that he owned a Glock pistol that was in the house.  Deering told officers that when he heard the popping noise, he saw an open window on the second floor of the home which closed after he shouted.  When Deering went to the residence, a male in the home answered through the door and claimed his twin brother shot at Deering's home.  Under all of these circumstances, the court finds it was objectively reasonable to conduct a limited protective sweep of 75 Motu Court.

The court also finds the scope of the protective search was limited to determine whether there was anyone else was in the home.  Officers testified that the protective sweep lasted approximately two or three minutes and that they only searched in areas where a person could have been hiding.  The court found Officer Spangler credible that he discovered the assault rifle (later determined to be a BB gun) on a bed under a pile of clothing and blankets large enough to hide a person.  One of the photographs admitted in evidence at the evidentiary hearing documented the condition of the bedding and clothing

on the bed where the gun was found.  The court also found Officer Sage credible that he saw an open nylon camera bag containing pipe bombs in the bedroom he entered.  Spangler testified Sage called him upon making the discovery and that Spangler also observed the pipe bombs in plain view in an open camera bag in the room.  Heenan corroborated the information in the government's Response that the duffel bag containing pipe bomb components was discovered and opened during execution of the search warrant.  Special Agent Heenan testified that the second bag containing pipe bombs was discovered during execution of the search warrant and was not the same open bag discovered during the protective sweep.  Accordingly, the scope of the search did not exceed a reasonable protective sweep as a precautionary measure to dispel reasonable suspicion someone else with access to Rodriguez's weapon(s) may be in the home and a threat to the officers.

### C.   Probable Cause & the Search Warrant.

Probable cause is required to justify certain governmental intrusions upon interests protected by the Fourth Amendment.  *See Ornelas v. United States*, 517 U.S. 690, 695 (1996); *Illinois v. Gates*, 462 U.S. 213, 241 (1983).  Probable cause to search exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place," *i.e.,* the place to be searched.  *Gates,* 462 U.S at 238.  "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'common sense, practical question.'" *United States v. Kelley*, 482 F.3d 1047 (9th Cir. 2007) (*citing United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)).

A determination of whether probable cause exists is made by examining the totality of the circumstances.  *Gates,* 462 U.S. at 241.  The Supreme Court has repeatedly emphasized that the probable cause standard is a "practical, non-technical conception." *Brinegar v. United States,* 338 U.S. 160, 176 (1949).  A probable cause determination is two-fold.  First, a court must determine "historical facts," that is, the events leading up to the stop or search.  *Ornelas,* 517 U.S. at 696.  Second, the court must determine "whether those historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause.  A judge's decision regarding probable cause should be given great deference.  *Id.* at 698-99.  The duty of a reviewing court is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Id.; see also United States v. Neilsen,*

371 F.3d 574, 579 (9th Cir. 2004).  A reviewing court is required to examine all the circumstances set forth in the affidavit, and in doubtful cases, to give preference to the validity of the warrant.  *United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir. 1985), *cert. denied,* 474 U.S. 874 (1985).

Facts supporting probable cause can come from several sources, including the observations of law enforcement who use their expertise and training to draw inferences of criminal activity from behavior that is not criminal on its face.  *See, e.g., Alford v. Haner,* 446 F.3d 935, 937 (9th Cir. 2006) (probable cause to arrest for impersonating officer where police observed police radio, scanner, and handcuffs in car).  Law enforcement can also use facts ascertained from a confidential informant.  *See, e.g., United States v. Reeves,* 210 F.3d 1041, 1045-46 (9th Cir. 2000) (probable cause for search warrant even though informant had criminal record because informant had previously provided reliable information).  Moreover, a "magistrate may rely on the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found."  *United States v. Fannin,* 817 F.2d 1379, 1381 (9th Cir. 1987).  An officer need not include all information in his possession to obtain a search warrant, but instead, need only show facts adequate to support a finding of probable cause.  *United States v. Johns,* 948 F.2d 599, 605 (9th Cir. 1991).  "Trustworthy information" must be used to support a probable cause determination and can include a tip from an informant so long as the tip is reliable.  *See Gates,* 462 U.S. at 283.  Reliability may be shown by the informant's past record of reliability, through independent confirmation, personal observation by law enforcement, or other means.  *See Alabama v. White*, 496 U.S. 325 (1995).

An affidavit supporting a search warrant establishes probable cause if it contains sufficient facts to justify a conclusion that the property which is the object of the search is probably on the premises to be searched at the time the warrant is issued.  *United States v. Hendricks*, 743 F.2d 653, 654 (9th Cir. 1984) (*quoting Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968)), *cert. denied*, 470 U.S. 106 (1985).  The Ninth Circuit has made it clear that courts are to evaluate staleness in light of the particular facts of the case and the nature of the criminal activity and property sought.  *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (internal quotation omitted).

First, Rodriguez asserts there was no probable cause to search for evidence of marijuana ingestion or distribution.  Rodriguez is not charged with narcotics-related offenses, and there is nothing

in the record to suggest the government intends to introduce any evidence of marijuana use or sales in the case.  From the police reports attached as exhibits to the Motion to Suppress, it appears that police seized three Dell computers and three marijuana smoking pipes.  *See* Incident Report of Detective R. Adams, attached as Exhibit C to Defendant's Motion to Suppress at 6.  The court agrees that the warrant does not state probable cause to believe Rodriguez was trafficking in marijuana.  There is nothing at all in the four corners of the warrant or its supporting affidavit to indicate that Rodriguez might be engaged in the sale of narcotics.  However, there was probable cause to believe that marijuana was being consumed at 75 Motu Court because Officers Spangler, Sage, and VanBeveren all smelled marijuana upon entering the foyer area of the home.

Second, Rodriguez asserts that the police lacked probable cause to search the vehicles listed in Items 8 and 9 of the search warrant.  There is no evidence in the record that anything was seized from either vehicle.  The government claims, and Rodriguez does not dispute, that both vehicles were parked in the driveway of the residence.  The Ninth Circuit has held that a search for a residence pursuant to a warrant may include all other buildings and all other objects within the curtilage of that residence even if not specifically referenced in the search.  *See United States v. Cannon,* 264 F.3d 875, 881 (9th Cir. 2001, *cert. denied,* 534 U.S. 1143 (2002).  The warrant expressly authorized the cars to be searched, and it is undisputed they were within the curtilage of the searched premises.  Accordingly, the search of the vehicles was not an unreasonable search or seizure.

Although the warrant did not state probable cause for the items related to drug trafficking, that does not render the entire warrant defective.  Patrial suppression, under the Ninth Circuit's severance doctrine, allows a court to strike invalid portions from a warrant and keep those that satisfy the requirements of the Fourth Amendment.  *See United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005) (*citing United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. 1984)).  Under the severance doctrine, "[o]nly those articles seized pursuant to the invalid portions need be suppressed." *Sears*, 411 F.3d. at 1129.  Here, although the warrant failed to state probable cause for items related to drug trafficking, there was ample probable cause for the remainder.  Accordingly, only items seized pursuant to the drug trafficking portion of the warrant–namely the Dell computers–should be suppressed.

/ / /

23

D.      **Good Faith Exception under *Leon*.**

In *United States v. Leon*, 468 U.S. 897, 925 (1984), the United States Supreme Court established an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant.  The Supreme Court held that the exclusionary rule should not bar evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, but ultimately found to be unsupported by probable cause.  Adopting a good faith reliance test, the Supreme Court reasoned that the rationale for the Fourth Amendment exclusionary rule was to deter unlawful *police* conduct.  If, after reviewing an affidavit and application for a search warrant, an issuing judge incorrectly concludes the affidavit states probable cause, the mistake is made by the judge not the police officer.  The court's prior precedents had held that the exclusionary rule's "primary purpose is to deter future unlawful police conduct, and therefore effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."  *United States v. Calandra*, 414 U.S. 338, 347 (1974).  In *Leon*, the Supreme Court recognized that, if an officer is acting as a reasonable officer would and should act in similar circumstances, that excluding evidence "can in no way affect his conduct unless it is to make him less willing to do his duty."  468 U.S. at 920.

The Supreme Court has emphasized that lower courts should apply the exclusionary rule pragmatically, balancing the costs of excluding evidence with the benefits of deterring overreaching by law enforcement officers.  *See Illinois v. Krull*, 480 U.S. 340, 347 (1987).  The Supreme Court has also held that courts have the discretion to determine whether the good faith reliance exception applies before determining whether a search warrant application and affidavit are supported by probable cause.  *Leon* at 923-25.  The Ninth Circuit has recognized that "[f]or the good faith reliance exception to apply, the officers must have relied on the search warrant in an objectively reasonable manner."  *Crews*, 502 F.3d at 1136 (*citing Untied States v. Clark,* 31 F.3d 831, 835 (9th Cir. 1984)).  The affidavit supporting the search warrant must at least establish a colorable argument for probable cause for the good faith exception to apply.  *Id.* (*citing United States v. Luong,* 470 F.3d 898, 903 (9th Cir. 2006)).  Therefore, the evidence seized in the search of a residence is admissible if there is a colorable argument that the search warrant was supported by probable cause because, if so, the officers' reliance on the search warrant was objectively reasonable.  A determination that the search warrant was objectively reasonable

1    "ends the inquiry without having to belabor the issue of whether the affidavit stated probable cause."

2    *Id.*

3    *Leon* recognized four exceptions in which the good faith exception does not apply because

4    reliance is, *per se* unreasonable.  They include: (1) where the issuing magistrate was misled by

5    information in the affidavit which was knowingly or recklessly false; (2) where the issuing magistrate

6    had abandoned the detached and neutral judicial role; (3) where the affidavit was so lacking in probable

7    cause as to render official belief in its existence entirely unreasonable; or (4) where the warrant is so

8    facially deficient in failing to particularize the place to be searched or things to be seized that the

9    executing officers could not reasonably presume it to be valid.

10   Rodriguez argues that because the evidence obtained and described in the affidavit was illegally

11   obtained after he was arrested without probable cause, the good faith exception does not apply.

12   However, as set forth above, the court found that the initial encounter between police and Rodriguez

13   was an investigatory detention supported by reasonable suspicion.  The court has also found that the

14   protective sweep was constitutionally justified and appropriately limited in scope to a cursory search of

15   areas where a person may have been hiding.  During the protective sweep, officers saw an open nylon

16   camera bag containing pipe bombs which caused them to immediately leave the home, evacuate the

17   neighborhood, and call the bomb squad.  The information in the warrant regarding officers'

18   observations during the protective sweep provided enough probable cause to search the residence for

19   evidence of explosive devices and tools or components used to manufacture explosive devices.

20   Information in the affidavit also stated probable cause to search for firearms.  Notwithstanding this, the

21   court finds that the four corners of the affidavit stated no facts whatsoever which would support a

22   finding of probable cause that Rodriguez was trafficking any narcotics.  Accordingly, the good faith

23   exception cannot apply to this item of the warrant because it is so lacking in probable cause that no

24   officer could reasonably rely upon it.

25   **E.      Particularity in Search Warrant.**

26   The Fourth Amendment requires "specificity" in the descriptions provided by search warrants.

27   Specificity has two aspects–"particularity and breadth."  *United States v. SDI Future Health, Inc.*, 568

28   F.3d 684, 702 (9th Cir. 2009).  "Particularity is the requirement that the warrant must clearly state what

25

1   is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable

2   cause on which the warrant is based."  *Id. (citing In re Grand Jury Subpoenas Dated Dec. 10, 1987*,

3   926 F.2d 847, 856-57 (9th Cir. 1991)).  In determining whether a warrant's description is sufficiently

4   specific to meet these Fourth Amendment requirements, the court must consider the following:

5       (1) whether probable cause exists to seize all items of a particular type
described in the warrant; (2) whether the warrant sets out objective standards

6   by which executing officers can differentiate items subject to seizure from
those which are not; and (3) whether the government was able to describe the

7   items particularly in light of the information available to it at the time the
warrant was issued.

8   *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).  Furthermore, a warrant may authorize the

9   seizure of an entire class of items if the warrant establishes probable cause to support the seizure of the

10  entire class, and a more precise description is not possible.  *See, e.g., United States v. Shi*, 525 F.3d 709,

11  732 (9th Cir. 2008) (warrant authorizing of variety of documents and items sufficiently particular

12  because agents were limited to seizing items identifying person in control of certain area, and further

13  specificity was impossible because officers could not tell what form evidence would take).

14      Rodriguez contends that the Ninth Circuit's recent decision in *Millender* supports his position

15  that the warrant lacked particularity because it sought to search for "[a]ny and all firearms."  In

16  *Millender*, a detective applied for and received an arrest and search warrant to search the home of a

17  person suspected of assaulting his girlfriend.  During the assault, the suspect allegedly pointed a black

18  sawed off shotgun with a pistol grip at his girlfriend and threatened to kill her.  The victim provided a

19  photograph of the weapon the suspect allegedly used.  The warrant allowed police to search for a wide

20  variety of weapons, including handguns, rifles, shotguns of any caliber, or any firearms at all.  The court

21  applied *Spilotro*'s three-factor test and held that the warrant lacked particularity because the

22  government was able to describe the firearm to be searched for and seized with more particularity in

23  light of the information available to it at the time of the search.  The court found that the government

24  "knew exactly what it needed and wanted."  *Millender*, No. 07-55518, slip op. 12709, 12727 (9th Cir.

25  Aug. 24, 2010) (en banc) (*citing VonderAhe v. Howland*, 508 F.2d 364, 369-70 (9th Cir. 1974)).

26      This case is clearly distinguishable from *Millender*.  In *Millender*, the police not only had a

27  description of the weapon used to commit the crime, but they also had a photograph of it.  Here, the

28  only information officers had concerning the weapon used to shoot at Mr. Deering's home was that

Deering heard a "popping" noise, heard something hit his roof, and believed a BB or a pellet gun was used.  As courts in this jurisdiction and others have recognized, BB and pellet guns can look like any number of other types of firearms.  *See, e.g., United States v. Franklin,* 161 F.Supp.2d 1087 (N.D. Cal. 2001) (pellet gun looked like revolver); *United States v. Shelton*, 490 F.3d 74 (1st Cir. 2007) (pellet gun looked like real handgun); *United States v. McKissic*, 428 F.3d 719 (7th Cir. 2005) (same); *United States v. Orr*, 312 F.3d 141 (3d Cir. 2002) (same).  The weapon found during the protective sweep looked like an assault rifle but turned out to be a pellet gun.  Police did not have a physical description or any other information about the weapon used to shoot at Deering's house to narrow the scope of the warrant.  The court finds the warrant satisfies the particularity requirement.

Based upon the foregoing,

**IT IS ORDERED** that Rodriguez's Motion for Pre-Hearing Discovery (Dkt. #30) IS DENIED AS MOOT.

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Dkt. #20) be GRANTED IN PART AND DENIED IN PART.  It is recommended that the Motion be granted to the extent that any evidence relating to the search for evidence of drug trafficking be suppressed.  It is further recommended that the Motion be denied in all other respects.

Dated this 22nd day of October, 2010.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

27